# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

TINA D. CLIFT                                                               PLAINTIFF

v.                         4:18cv00629-BRW-JJV

NANCY A. BERRYHILL,
Acting Commissioner of Social Security                          DEFENDANT

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

This recommended disposition has been submitted to United States District Judge Billy Roy Wilson. The parties may file specific objections to these findings and recommendations and must provide the factual or legal basis for each objection. The objections must be filed with the Clerk no later than fourteen (14) days from the date of the findings and recommendations. A copy must be served on the opposing party. The district judge, even in the absence of objections, may reject these proposed findings and recommendations in whole or in part.

## RECOMMENDED DISPOSITION

### I. INTRODUCTION

Tina D. Clift ("Plaintiff") has appealed the final decision of the Commissioner of Social Security to deny her claim for a period of disability and disability insurance benefits. (Doc. No. 3.) Both parties have submitted appeal briefs (Doc. Nos. 12-13), and the case is now ready for a decision.

A court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and free of legal error. *Slusser v. Astrue*, 557 F.3d 923, 925 (8th Cir. 2009); *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996). In assessing the substantiality of the evidence, courts must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it; a court may not, however, reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision. *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

The history of the administrative proceedings and the statement of facts relevant to this decision are contained in the respective briefs and are not in serious dispute. Therefore, they will not be repeated in this opinion except as necessary. After careful consideration of the record as a whole, I find the decision of the Commissioner should be reversed and remanded.

Plaintiff was forty-three years old at the alleged onset date of her disability on April 7, 2013, and she was forty-seven years old at the time of the expiration of her Title II insured status on September 30, 2017. (Tr. 167.) She testified she earned a GED. (Tr. 39.) She has past relevant work as a counter clerk and delivery driver for pharmacies. (Tr. 27, 39-40.)

The Administrative Law Judge[1] ("ALJ") found Plaintiff had a combination of "severe" impairments – namely, hypertension, major depressive disorder, and generalized anxiety disorder. (Tr. 18.) The ALJ found other disabling conditions alleged by Plaintiff – migraine headaches and

---

[1] The ALJ followed the required sequential analysis to determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; and (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(a)-(g) and 404.1520(a)-(g).

insomnia – were not severe and would pose no more than a minimal effect on her ability to perform basic work activities. (Tr. 18-19.) The ALJ further found Plaintiff did not have an impairment or combination of impairments meeting or equaling an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.[2] (Tr. 20-21.)

The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with specified nonexertional limitations. (Tr. 22-27.) Given this RFC, Plaintiff was unable to perform her past relevant work. (Tr. 27.) Therefore, the ALJ relied on the testimony of a vocational expert and concluded, given Plaintiff's age, education, work experience, and RFC, she was capable of making a successful adjustment to other work. (Tr. 28.) Specifically, she would be able to perform the requirements of representative occupations such as kitchen helper and handpacker. (*Id.*) Accordingly, the ALJ determined Plaintiff was not disabled. (*Id.*)

## II. TREATING DOCTOR'S OPINION

In support of her Complaint, Plaintiff argues the ALJ erred by discrediting the opinion of her treating doctor on the issue of her migraine headaches. (Doc. No. 12 at 11-16.) Plaintiff was under the care of Dr. Deborah Quade from 2012 through 2015. (Tr. 532-50.) On October 7, 2015, Dr. Quade completed a "Treating Physician's Migraine Headache Form," stating Plaintiff had migraines affecting her entire head and neck at a frequency of less than one per week with an average duration of twenty-four hours. (Tr. 529.) Dr. Quade noted Plaintiff's associated symptoms included nausea and vomiting, photophobia, and phonophobia. (*Id.*) She further noted Plaintiff was taking Phenergan, hydroxyzine, and Meloxicam; her response to medication

---

[2] 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926.

was poor; and the headaches interfered with her ability to work, causing her to miss less than one day per week. (*Id*.) The ALJ declined to give Dr. Quade's opinion significant weight, reasoning as follows:

> The undersigned gives Dr. Quade's opinion little weight, as it is quite conclusory, providing no explanation of the evidence relied on in forming her opinion. Dr. Quade apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Although Dr. Quade has treated the claimant, there are no laboratory and/or diagnostic test results which she performed that demonstrate and/or support her opinion. The evidence of record does not contain a sufficient number of detailed physical examinations of the claimant during actual treatment visits with Dr. Quade that support this opinion.

(Tr. 18.)

"The opinion of a treating physician is accorded special deference under the social security regulations" and is "normally entitled to great weight." *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010)). It is true, however, that an ALJ may assign "little weight" to a treating doctor's opinion when it is internally inconsistent or conclusory. *Id*. (citing *Chesser v. Berryhill*, 858 F.3d 1161, 1164-65 (8th Cir. 2017)). The United States Court of Appeals for the Eighth Circuit has held the assessments of treating doctors possess "little evidentiary value" when they "consist of nothing more than vague, conclusory statements – checked boxes, circled answers, and brief fill-in-the-blank responses" and "cite no medical evidence." *Id*. (citing *Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014)). The headache form at issue here was most certainly conclusory and lacked any discussion of the medical evidence supporting Dr. Quade's conclusions.

But, as Plaintiff points out (Doc. No. 12 at 12), a treating doctor's opinion, even one in the style of a check-the-box form, should not be discounted when it is supported by medical evidence in the record. As the Eighth Circuit has explained, "[w]e have upheld an ALJ's decision to

4

discount a treating physician's MSS where the limitations listed on the form 'stand alone,' and were 'never mentioned in [the physician's] numerous records of treatment' nor supported by 'any objective testing or reasoning.'" *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)); *see also Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). The Eighth Circuit has "never upheld a decision to discount an MSS on the basis that the 'evaluation by box category' is deficient *ipso facto*." *Reed*, 399 F.3d at 921.

Here, Plaintiff's treatment records support her treating doctor's opinion regarding her limitations. On June 27, 2012, she reported a migraine to Dr. Quade, who prescribed Toradol. (Tr. 550.) When the Toradol failed to work, Dr. Quade prescribed hydroxyzine. (Tr. 549.) At a check-up on August 29, 2012, Plaintiff reported she had had a headache for the last two months. (Tr. 547.) At a check-up on January 29, 2014, Dr. Quade's official diagnoses included migraine headaches. (Tr. 545.) This diagnosis was listed again in treatment notes dated May 7, 2014, and May 21, 2014. (Tr. 542-43.) At a check-up on June 25, 2014, Plaintiff reported she had had a migraine the previous week. (Tr. 541.) Dr. Quade advised she could take up to four hydroxyzine at a time. (*Id*.) At a check-up on August 12, 2014, Plaintiff reported she was having headaches "almost every day." (Tr. 540.) Dr. Quade continued the hydroxyzine and also prescribed hydrocodone. (*Id*.) On September 15, 2014, Plaintiff reported she was currently suffering from a headache. (Tr. 539.) Dr. Quade advised her to discontinue caffeine and NSAIDS. (*Id*.)

Plaintiff saw Dr. Quade for other reasons in April and August of 2015; treatment records from those visits show Plaintiff was taking Meloxicam. (Tr. 534-35.) On September 9, 2015, Plaintiff reported a headache and said the Meloxicam did not help her. (Tr. 534.) Dr. Quade continued the hydroxyzine and added Phenergan. (*Id*.) On October 7, 2015 – the date Dr. Quade completed the headache form – Plaintiff reported headaches affecting her entire head and neck that

occurred one to three times monthly. (Tr. 533.) In her treatment notes, Dr. Quade acknowledged Plaintiff's "poor response" to Phenergan, hydroxyzine, and Meloxicam. (*Id*.) On October 15, 2015, Plaintiff reported three headaches since her last visit, although the medications were now helping. (Tr. 532.) On November 3, 2015, Plaintiff told a counselor she had suffered from "migraine headaches for the past month." (Tr. 563.)

After Dr. Quade's retirement, Plaintiff began seeing Dr. Kirk Watson. On December 8, 2015, she presented with what Dr. Watson called a "classic migraine," which Plaintiff reported had begun two days prior and was "severe and throbbing." (Tr. 572.) Dr. Watson noted she had been diagnosed with migraines "several years ago," with associated symptoms including nausea and photophobia. (*Id*.) He prescribed hydrocodone and acetaminophen. (Tr. 573.) Plaintiff saw Dr. Watson for other reasons through the end of 2015 and through most of 2016; the treatment notes from these visits consistently included migraine headaches in the list of "[c]urrent [p]roblems." (Tr. 596, 600, 606, 621, 629-32, 639.) At a visit on September 2, 2016, Dr. Watson noted Plaintiff reported she was taking her husband's pain medications intermittently for her migraines. (Tr. 631.)

This medical evidence supports Dr. Quade's conclusions regarding the frequency, duration, and symptoms associated with Plaintiff's migraine headaches. In particular, treatment records from the day Dr. Quade completed the headache form show Plaintiff was experiencing migraines one to three times monthly – in other words, less than one per week, as Dr. Quade indicated on the form – at that point in time. (Tr. 533.) Other treatment records show Plaintiff experienced migraines much more frequently at other times. (Tr. 532, 540, 563.) The treatment records also indicate Plaintiff tried several different medications, alone and in combination, with limited success. Although some helped more than others at various times, the fact that she tried

6

so many combinations and resorted to using her husband's medications supports Dr. Quade's characterization of her response to medication as poor. The medical evidence also supports Dr. Quade's conclusion that Plaintiff's migraines lasted twenty-four hours on average, with some treatment notes mentioning a much longer duration. (Tr. 547, 572.) This duration, in combination with the frequency of Plaintiff's headaches, would clearly affect her ability to work. I note the vocational expert's testimony that all jobs would be eliminated for a person likely to miss three days of work per month on a consistent basis. (Tr. 59-60.)

Moreover, I disagree with the ALJ's criticism that Dr. Quade's opinion relied too heavily on Plaintiff's subjective reports of symptoms. In short, there is no other way to diagnose a migraine headache. Dr. Quade could not have performed a laboratory or diagnostic test to check for migraines because no such test exists. And as Plaintiff's treating physician, Dr. Quade would have been in the better position to evaluate Plaintiff's complaints and determine her limitations.

For these reasons, I find the ALJ erred in discounting Dr. Quade's opinion. Although the headache form itself was quite conclusory, it was supported by consistent medical evidence in the record. As the Eighth Circuit has stated, an ALJ may discount or even disregard a treating physician's opinion "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). Neither is the case here.

### III. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff also argues the ALJ erred in evaluating her RFC. (Doc. No. 12 at 16-23.) The ALJ found Plaintiff had "some depression and anxiety"; however, he concluded the medical evidence did not support a finding of disability. (Tr. 25.) He determined Plaintiff had the RFC

to perform a full range of work at all exertional levels, with the following nonexertional limitations: the work must be limited to simple, routine, and repetitive tasks, with supervision that is simple, direct, and concrete; the work must be limited to SVP 1 or 2 jobs that could be learned within thirty days; Plaintiff could have no more than occasional changes to the workplace setting; and there could be no interaction required with the general public. (Tr. 22.)

Plaintiff takes issue with the ALJ's finding that she did "well" with her depression and anxiety as long as she took her medications as prescribed. (Tr. 25.) I agree with Plaintiff that this assessment lacks support in the record. I count seven instances where Plaintiff reported having suicidal ideations. In August 2012, she attempted suicide by cutting her wrist with a razor blade.[3] (Tr. 435-37.) She reported having had suicidal ideations "for some time." (Tr. 437.) The record reflects she was taking medications for her depression and anxiety at that time. (Tr. 440-41.) In August 2015, Plaintiff was hospitalized twice for suicidal ideations. The first time, she reported having had suicidal ideations for three weeks and had a plan to drive her car into a tree. (Tr. 310.) The second time, she threatened to shoot herself in the emergency room and, when transferred to inpatient care at another hospital, reported a plan to slash her wrists. (Tr. 278, 478.) Records from both hospitalizations show she had prescriptions for her depression and anxiety. (Tr. 276, 310.) In January 2016, Plaintiff presented to her primary care physician with worsening depression and suicidal thoughts. (Tr. 600.) She was taking several medications for depression and anxiety at that time. (Tr. 601-02.) In April 2016, Plaintiff again reported to her primary care physician that she was having suicidal thoughts. (Tr. 621.) Again, she was taking

---

[3] I note Defendant's contention that this incident is irrelevant because it occurred prior to the alleged onset of Plaintiff's disability. But the ALJ considered it, and it occurred close in time to the date of alleged onset – April 7, 2013. Moreover, it is relevant to Plaintiff's assertion that her preexisting depression and anxiety worsened to the point of debilitation starting in 2012.

several medications at that time. (Tr. 621-22.) In April 2017, Plaintiff told her therapist she periodically had suicidal thoughts, and in August 2017, she reported "frequent [suicidal ideations] without a plan." (Tr. 683, 701.) In short, Plaintiff's recurrent suicidal ideations, despite the use of prescription medications, indicate her depression and anxiety were not well controlled.

In addition, the medical records and mental health counseling notes show Plaintiff struggled significantly with her depression and anxiety throughout the relevant time period, having multiple symptoms beyond the suicidal ideations. Despite being on medication, she reported feelings of panic, irritability, and her mood being "all over the place." (Tr. 537, 541, 544.) Dr. Quade diagnosed her with "severe" clinical depression (Tr. 534, 547) and often described her as "ill-appearing" and tearful with a flat affect. (Tr. 533, 534, 542, 547.) Dr. Watson also characterized Plaintiff's depression as "severe" and noted her symptoms included anhedonia, anxious mood, crying spells, sadness, and suicidal thoughts, despite taking medications including an antidepressant and an anxiolytic. (Tr. 600.) These symptoms persisted despite Dr. Watson adding to Plaintiff's medications. (Tr. 639.) Plaintiff's therapist also repeatedly noted her "anxious" and "depressed" affect and mood. (Tr. 553, 563, 569, 661, 683, 701, 737, 751, 755, 767, 785.) Plaintiff reported to her therapist that she was happiest when asleep and stayed in bed most days, "isolating from others a majority of the time." (Tr. 563, 767.) She said she secluded herself to avoid panic attacks, sometimes not leaving her house for three weeks at a time. (Tr. 687.) She also reported intense feelings of anger. (Tr. 785.) The therapist noted "multiple thinking errors and poor insight or ability to see beyond catastrophic assumptions." (Tr. 767.) At one point, Plaintiff wished to discontinue therapy, telling her therapist she was feeling better on a new medication prescribed by her primary care physician. (Tr. 732.) The therapist encouraged her to continue, noting it did not appear to be a "rational" decision "in light of her

9

history of [suicidal ideations] and severe depression." (Tr. 733.) Six months later, Plaintiff returned to therapy reporting increased depression and panic attacks. (Tr. 707.) Her symptoms included feelings of hopelessness and worthlessness, irritability, appetite disturbance, social withdrawal, loss of interests, crying spells, and a history of verbal outbursts and destruction of personal property. (*Id.*)

It is true, as Defendant points out, that the medical and counseling records show some brief periods of improvement. On a couple of occasions, Dr. Quade described Plaintiff's affect as "bright." (Tr. 540, 543.) In December 2015, Plaintiff told her therapist that having suicidal thoughts and cutting herself were out of character for her, and she did not expect either to happen again. (Tr. 553.) And, as previously noted, Plaintiff discontinued therapy – against the advice of her therapist – in September 2016. (Tr. 732-33.) However, each of these instances was followed, weeks or months later, by Plaintiff's reports of continuing and sometimes worsening symptoms. Read as a whole, the medical and counseling records indicate Plaintiff's symptoms fluctuated somewhat, possibly as a result of changes in her medications, but never actually subsided for any significant length of time. Her periods of improvement were infrequent and brief. Contrary to the ALJ's finding, I find Plaintiff's depression and anxiety were not well controlled, despite ongoing medication and counseling.

In addition, the ALJ noted Plaintiff had suffered from mental health conditions since 1993 but worked from 1993 to 2013 with only two years of no wages during that time. (Tr. 25.) However, this does not undermine Plaintiff's credibility or indicate she is able to work despite her impairments. As Plaintiff points out, the medical evidence indicates her mental health began seriously deteriorating in 2012. She testified she was fired from her job in 2013 "for missing too much work" due to her health issues. (Tr. 41.) That Plaintiff previously worked with a less

debilitating case of depression and anxiety does not establish she was able to work after her condition deteriorated.

Lastly, Plaintiff takes issue with the ALJ's finding that her daily activities were not "severely restricted due to emotional causes," a finding that was based in part on a Function Report completed by Plaintiff in October 2015. (Tr. 25, 213-20.) As the ALJ pointed out, Plaintiff stated she was able to attend to her personal care and grooming without assistance, take her medications without reminders, care for pets, prepare her own meals, perform household chores, drive, shop, and pay bills. (Tr. 213-16.) However, in that same report, Plaintiff also stated she could not maintain a regular schedule, spent most of her time at home in pajamas, showered only once or twice per week, prepared only "easy and fast" meals, rarely performed household chores, could not do yard work, sometimes did not go outside at all, only made quick shopping trips, and spent a lot of her days "in bed or avoiding things or people." (Tr. 213-18.) She further said she had problems with memory, concentration, understanding, and getting along with others. (Tr. 218.) She said she did not handle stress or changes in routine well and had unusual fears. (Tr. 219.) These limitations are consistent with the medical and counseling records and the hearing testimony, all of which indicate Plaintiff spent most of her time in bed. By the time of the hearing before the ALJ – which took place approximately three months after the expiration of Plaintiff's insured status – she was showering only twice per month and did not get out of bed at all about four or five days per week. (Tr. 45, 51.) Contrary to the ALJ's conclusion, the evidence shows Plaintiff's depression and anxiety severely restricted her daily activities.

## IV. CONCLUSION

For all of these reasons, I find the ALJ's decision is not supported by substantial evidence. I do not take lightly remanding this case to the Commissioner, but I find it necessary. On remand,

the Commissioner should more fully consider the opinions of Plaintiff's treating physicians. The Commissioner should also reconsider the evaluation of Plaintiff's RFC for all of the above-stated reasons.

IT IS, THEREFORE, RECOMMENDED that the final decision of the Commissioner be reversed and this case be remanded for proceedings consistent with this opinion. This would be a "sentence four" remand within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 1st day of March 2019.

_____
JOE J. VOLPE
UNITED STATES MAGISTRATE JUDGE